ELIAS FACUSEH AND MARGARITA FACUSEH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Facuseh v. Commissioner
Docket No. 28579-82.
United States Tax Court
T.C. Memo 1988-10; 1988 Tax Ct. Memo LEXIS 10; 54 T.C.M. (CCH) 1489; T.C.M. (RIA) 88010; January 6, 1988. *10 Respondent, using the bank deposits and cash expenditures methods of income reconstruction, determined that petitioners, husband and wife, had unreported income from the husband's currency exchange business. Held: petitioners have proven that $ 300,000 of deposits were from nontaxable sources; petitioners have also proven that some expenditures were made from nontaxable sources. Held further, petitioners are liable for an addition to tax under section 6653(a). Held further, petitioners have not carried their burden of proof as to remaining issues. Held further, petitioner-wife is entitled to innocent spouse relief under section 6013(e). David Garvin, for the petitioners. Mitchell Horowitz, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By notice dated September 20, 1982, respondent determined a deficiency in petitioners' Federal income tax for 1981 in the amount of $ 422,219. Respondent also determined an addition to tax under section 6653(a)(1)[1] of $ 21,111. [2] After concessions, the remaining issues are: (1) whether petitioners have $ 446,000 of unreported income in 1981; (2) whether petitioners are entitled to a medical expense deduction *11 of $ 1,427 over that allowed by respondent; (3) whether petitioners are liable for $ 2,372 in self-employment taxes; and (4) whether petitioner Margarita Facuseh is entitled to innocent spouse relief pursuant to section 6013(e). FACTS Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time the petition herein was filed, petitioner Margarita Facuseh (W) resided at 1147 Southwest 78th Street in Miami, Florida. Petitioner Elias Facuseh (H) maintained a legal residence at the same address, but was not living there at the time of trial. During 1981, petitioners maintained three bank accounts at banks in the Miami area. Respondent included in petitioners' income the following deposits made into these bank accounts during 1981: Continental National Bank
$ 111,041
Southeast First National Bank
16,299
First National Bank of South Miami
323,149
Total
$ 450,489
Respondent *12 also included $ 269,074 of cash expenditures in petitioners' gross income. These consisted of $ 150,000 of attorney's fees, $ 55,000 [3] used to buy a parcel of real estate, rent, car payments, medical expenses, and other miscellaneous expenses. Until December 28, 1981, H's parents, Solomon and Petra Facuseh (Mr. and Mrs. Facuseh), also maintained a bank account at the First National Bank of South Miami. On February 15, 1981, petitioners received from Mr. and Mrs. Facuseh a $ 150,000 check drawn on the latter's First National Ban of South Miami account. On the same date, the first of two letters of exchange [4] *13 was prepared which stated that H would pay Mr. Facuseh the sum of 7,350,000 Columbian pesos on or before July 15, 1985. [5] This payment was intended to pay for H's expected attorney's fees, as H was then a target of a Federal Bureau of Investigation undercover investigation into money laundering by the name of Operation Bancoshares. During March 1981, H determined that he did not need the money his parents had forwarded him. He then gave a check for $ 120,000 to his brother Jorge Facuseh [6] who was to give the money to Mr. Facuseh. H combined the remaining $ 30,000 with his own funds to buy a parcel of real estate. In May 1981, H was visited at his home by Drug Enforcement Administration agents and was informed that he was a target of a grand jury investigation known as Operation Greenback. This investigation had no connection with Operation Bancoshares. On May 28, 1981, H testified before this grand jury. He was indicted on July 31, 1981, for conspiracy in violation of Title 18 U.S.C. sec. 371 (1982) and title 21 U.S.C. sec. 841(a)(1) (1982). On July 10, 1981, agent Tony Franco of Operation Bancoshares spoke by telephone *14 with Mrs. Facuseh in Santa Marta, Colombia. She explained to him that she was holding money for certain clients of H and Jorge, and was being "harassed" by them because she would not release the money without express authority from one of the two sons. She asked Agent Franco (whom she knew as Tony Fernandez) to find either H or Jorge so that one of them could call her with approval to release this money. [7] On another occasion H had informed Agent Franco that he (H) had frequently moved large amounts of cash offshore, to the Cayman Islands among other places. Just prior to his indictment, and anticipating further legal trouble, H again received $ 150,000 from Mr. and Mrs. Facuseh. This check was dated July 24, 1981, and was drawn on Mr. and Mrs. Facuseh's First National Bank of South Miami checking account. A second letter of exchange dated July 24, 1981, was prepared in the amount of $ 7,500,000 Colombian pesos which was to be repaid on or before July 24, 1983. On July 25, 1981, H's brother, Jose Facuseh, executed a currency transaction report stating that Jose was bringing a $ 150,000 check *15 into the United States from Colombia. [8] Petitioners deposited this check in their First National Bank of South Miami account on July 28, 1981. On August 4, 1981, H was arrested pursuant to a warrant issued by the United States District Court for the Southern District of Florida. On that same date he appeared before a United States magistrate who ordered him held on $ 30 million bond. On August 6, 1981, W withdrew $ 150,000 from the First National Bank of South Miami which she negotiated at the InterAmerican Federal Savings and Loan Association of Miami for a cashier's check made payable to Gustavo Padilla (Padilla). As W knew no attorneys, and given the fact that H did not want her involved, Padilla was to find an attorney to represent H in the criminal matter. However, before Padilla could obtain an attorney, H decided to employ James Jay Hogan (Hogan) in his defense. On August 17, 1981, Padilla purchased a $ 150,000 cashier's check at InterAmerican Federal Savings and Loan Association payable to Hogan, which Hogan deposited in this account at Barnett Bank the *16 same day. On November 6, 1981, H was able to post a reduced bond of $ 100,000 cash plus $ 250,000 personal surety. Conditions were then set for his release. He had been continually incarcerated since his arrest on August 4, 1981. Prior to October 26, 1982, H disappeared and on that date a judgment of bond forfeiture was entered by the United States District Court for the Southern District of Florida based on a probation officer's affidavit that H had violated the conditions of his release. On January 31, 1983, the case of United States of America v. Elias Facuseh[9] was placed on the fugitive case list. H did not appear at the trial of this case. During and prior to 1981, petitioners and their two sons lived in a rented home in Miami. The home was neither lavishly furnished nor finely appointed. They owned two automobiles, one of which was forfeited to the United States Government as part of the criminal proceedings against H. Neither petitioner displayed any of the trappings of wealth, and W had no knowledge of any family assets other than those that might be owned by persons of modest means. H never discussed any of his business activities *17 with her, and she very rarely had even social contact with his business associates. As was traditional among Latin American families, W never inquired about family finances, over which H had complete control. W was unaware of the facts as to or the amount of income H had from his currency exchange business. She believed his only business involved the import and export of goods. She believed that the monies received from Mr. and Mrs. Facuseh were loans. OPINION Section 446(a) provides that "taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, "if no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b). Respondent has at his disposal a number of methods with which to reconstruct a taxpayer's income, among which are the bank deposits and cash expenditures methods. These two methods, either alone or in combination, are generally accepted methods of income reconstruction. *18 Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). In income reconstruction cases, the burden of proof remains with the taxpayer. Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967), affg. in part a Memorandum Opinion of this Court. Respondent determined that petitioners had unreported income in 1981 reflected by $ 450,489 of bank deposits and $ 269,074 of cash expenditures. Respondent allowed deductions in the total amount of $ 38,000 and after subtracting reported income of $ 179,763 determined that petitioners had $ 501,000 of unreported income. Respondent has since conceded that $ 55,000 included as a cash expenditure had previously been included in the calculation of bank deposits. Respondent has also conceded the deductibility of $ 150,000 in legal fees paid to Hogan for H's criminal defense. Respondent still contends that the $ 150,000 paid to Hogan was a cash expenditure and was not derived from the proceeds of any bank deposit. Petitioners contend that $ 300,000 of bank deposits are loans from H's parents. Petitioners also contend that the $ 150,000 paid to Hogan for attorneys' fees was derived from the proceeds *19 of one of the bank deposits in that amount also determined to be includable in gross income. Petitioners deposited $ 150,000 in their First National Bank of South Miami account on July 28, 1981. Respondent included this amount in petitioners' gross income. Respondent included an additional $ 150,000 in petitioners' gross income as a cash expenditure based on the purchase of a $ 150,000 cashier's check made payable to Padilla which was used to pay H's attorneys' fees. We are convinced that this cashier's check was purchased with funds withdrawn from petitioners' First National Bank of South Miami account. We, therefore, agree with petitioners that inclusion in income of both the deposit and the expenditure amounts to a double inclusion and that the expenditure should not be included in gross income. In support of their contention that the $ 300,000 of deposits is a loan from H's parents, petitioners offered copies of two checks totaling $ 300,000 drawn on Mr. and Mrs. Facuseh's checking account at the First National Bank of South Miami, bank statements for 1981 for that account, two letters of exchange, an accountant's statement concerning the net worth of Mr. and Mrs. Facuseh, and *20 the testimony of W and Mrs. Facuseh. Mrs. Facuseh's testimony supports petitioners' contention that the advances to petitioners were loans. She also testified that she had never assisted H in any of his business activities and had never spoken to Agent Franco, who was known to her as Tony Fernandez. Respondent speculates that these two deposits were actually H's own money derived from illegal sources. Agent Franco testified concerning a telephone conversation in which Mrs. Facuseh asked him to find either H or Jorge. In this conversation, she stated that she needed approval from one of them to release a large sum of money to one of their clients who had been "harassing" her. Even after Agent Franco's testimony to the contrary, petitioners initially continued to assert that respondent had not shown that it was in fact Mrs. Facuseh that Agent Franco had spoken with. However, petitioners later stipulated to this fact. In view of this concession, we can accord little credibility to any of Mrs. Facuseh's testimony. However, we find that other evidence submitted by petitioners makes a prima facie showing that the two $ 150,000 deposits were either loans or gifts from Mr. and Mrs. *21 Facuseh. The sourcing of these two checks is established without Mrs. Facuseh's testimony. Further, there is no evidence to support respondent's speculation that the funds in this bank account belonged to anyone other than Mr. and Mrs. Facuseh. Petitioners having made such a showing, the burden of going forward with the evidence, but not the burden of proof, shifts to respondent. See Adler v. Commissioner,85 T.C. 535, 540-541 (1985). Respondent's evidence as to compensation received by petitioner during 1981 from money laundering or other illegal activities, to the extent that it may be considered as impeachment evidence, is not connected in any fashion with the bank account of Mr. and Mrs. Facuseh. The fact that H may have profited from his money laundering or other activities, and may have moved cash outside this country, does not suggest that such money found its way into the Facuseh's Miami bank account. These two checks are not unreported income to petitioners. As petitioners point out on brief, the elimination of the two $ 150,000 checks from unexplained deposits and the allowance of the $ 150,000 attorney's fee paid with the cashier's check appears to eliminate the deficiency *22 determined by respondent in the statutory notice. However, respondent on brief argues as an alternative to the statutory notice theory that the evidence in the record as to the amounts of money laundered by H and the range of commissions received by him thereon, together with testimony showing that from June 10, 1981, to July 29, 1981, the F.B.I. undercover operation paid H $ 193,000 supports respondent's contention that H received at least $ 446,000 of unreported income. [10] Respondent's alternative theory is supported in part by stipulated facts that H brought to the F.B.I. agents' running Bancoshares almost $ 34,000,000 to be laundered. [11] *23 Respondent's impeachment witness, Agent Franco testified that H admitted that his fees ranged from 1 percent to 5 percent of money handled. One percent of this sum or approximately $ 340,000 plus the fees in the amount of $ 193,000 paid by Bancoshares to H would more than support respondent's deficiency determination. Petitioners object to this evidence on several grounds, including the fact that it is a new issue which is raised too late. We note that the statutory notice is very specific in charging petitioners with unreported income consisting of deposits in three bank accounts in specific amounts together with $ 269,074 in cash expenditures which include the $ 150,000 attorney's fee. The petition asserts error in the inclusion in the bank deposits of the two $ 150,000 checks from the Facusehs and the failure to allow the attorney's fee as a deduction. Respondent's answer is a simple denial. The amended petition and answer thereto raise only the innocent spouse issue. Respondent's trial memorandum states that the income and deduction issues are those on which the deficiency is based which petitioners claimed to be erroneous. That memorandum failed to list Agent Franco as a witness notwithstanding the provisions of the Standing Pretrial Order which require each party to name all witnesses other than those needed for impeachment. During the trial in answer to our inquiry of respondent's counsel as to the relevance of Agent Franco's testimony as to petitioner's money laundering *24 activities, the following colloquy took place: MR. HOROWITZ: No, we're not, Your Honor. What we're trying to do is, Mr. de Facuseh has made certain statements regarding the sources of his income -- THE COURT: Mr. de Facuseh has? MR. HOROWITZ: To Mr. Franco yes, he has, Your Honor. In order for the Court to appreciate the degree of trustworthiness that these statements should have, it's necessary to develop Mr. de Facuseh's relationship with Mr. Franco and the other undercover agents? THE COURT: This is trying to rebut the testimony as to the loans by Mr. de Facuseh's parents? MR. HOROWITZ: Among other things, yes, Your Honor. THE COURT: All right. Continue.
At no time during the trial did respondent's counsel suggest that Agent Franco's testimony was to be used to sustain the tax deficiency on the alternate theory advanced in respondent's opening brief. Agent Franco's testimony was admissible and was admitted solely for impeachment. It did serve to impeach Mrs. Facuseh. Respondent has not yet explained what "other things" it impeached. But that testimony was understood by the Court to be limited to impeachment. It would be a violation of our Standing Pretrial Order for the testimony *25 to be used to support respondent's alternative theory of unreported income without leave of Court which was not requested by respondent's counsel. If counsel's response in that colloquy was in fact a disingenuous effort to notify the Court and opposing counsel of respondent's new theory, it was totally insufficient. The time at which new matter is introduced governs to a large extent the treatment that will be given to such matter by this Court. New matter raised in respondent's answer places the burden of proof on respondent with respect to such matter. Rule 142(a). [12] *27 However, this Court has held that matter raised for the first time on brief will not be considered. Theatre Concessions, Inc. v. Commissioner,29 T.C. 754 (1958). A Theatre Concessions makes clear, this rule is not limited to the case in which respondent wishes to make an addition to the deficiency, but also when a new theory of liability is asserted. In refusing to consider respondent's second argument regarding the computation of the taxpayer's excess profits tax under the 1939 Code we stated: With regard to this second argument of respondent on this issue, there is no reference to it in the pleadings and it *26 was not mentioned in the opening statement of respondent's counsel at the trial herein. * * * * * * This theory was advanced by respondent for the first time in his brief filed long after the trial of this case and at a time when petitioner was helpless to remedy its position. We think that rudimentary principles of equity and justice forbid our consideration of a theory advanced by the respondent in such a way and at such a time. Petitioner was not apprised of the necessity of evidence with which to meet this contention at the time of the hearing. The fundamental purpose of pleadings is to inform the parties, and the Court, of the issues involved, and certainly the taxpayer is entitled to know, at least by the date of the hearing, the ground upon which the Commissioner has acted and the contention which he is required to meet in order to establish the error of the determination. * * *
Theatre Concessions, Inc. v. Commissioner, supra at 760. See also Aero Rental v. Commissioner,64 T.C. 331, 338 (1975). The same result obtains when respondent attempts to raise a new theory at trial, as may have been respondent's intent. As we stated in Estate of Horvath v. Commissioner,59 T.C. 551 (1973): It is well settled that the respondent's determination may be affirmed for reasons other than those assigned in his notice of deficiency. [Citations omitted.] However, it is equally clear that the Court must determine whether there has been surprise and substantial disadvantage to the petitioner in the presentation of his case because of the manner in which the statutory notice and pleadings were drawn when compared to the issues raised at the trial. * * *
Estate of Horvath v. Commissioner, supra at 555. [13]
Horvath speaks directly to the circumstances with which we are now confronted. Respondent's position taken in the statutory notice *28 that the deficiency in petitioners' income was based upon the bank deposits and cash expenditures method of income reconstruction could not have been more clear or more exclusive. Nowhere in the pleadings, stipulation, discovery documents or respondent's trial memorandum is it indicated that respondent will seek to rely on this new theory. Petitioner as well as the Court, are entitled to rely on the pleadings, which are intended to be a guide to litigation. Theatre Concessions, Inc. v. Commissioner, supra at 760. Respondent's attempt to deviate from the path that he initiated with the statutory notice and helped chart with his pleadings cannot be given effect. [14]
The next issue is whether petitioners are liable for an addition to tax for negligence or intention disregard of rules and regulations pursuant to section 6653(a). [15] The burden of proof in regard to the addition is upon petitioners. Bixby v. Commissioner,58 T.C. 757 (1972). Petitioners' having presented no evidence to rebut respondent's determination, *29 we find for respondent on this issue. Respondent's notice of deficiency raised issues concerning medical expense deductions and self-employment tax. Petitioners have not responded to these determinations and have not carried their burden of proof with respect to these items. We therefore hold for respondent on these issues. The final issue is whether petitioner W is entitled to innocent spouse relief under the provisions of section 6013(e). Ordinarily, when a joint return is made, liability with respect to the tax computed on aggregate income of the husband and wife is joint and several. Sec. 6013(d)(3). However, section 6013(e) provides a certain measure of relief if the following four conditions are met: (1) a joint return has been made; (2) the return shows a substantial understatement (defined by section 6013(e)(3) as any understatement over $ 500) of tax attributable to grossly *30 erroneous items (which includes any item omitted from gross income; section 6013(e)(2)(A)) of one spouse; (3) the other spouse establishes that he or she did not know and had no reason to know of the substantial understatement at the time the return was signed; and (4) it is inequitable to hold the other spouse liable for the liability attributable to such substantial understatement. Petitioners filed a joint return for 1981 and have met the first condition. Whether the second condition has been satisfied must await the outcome of the parties' Rule 155 calculations; if there remains unreported income and the understatement exceeds $ 500, W may be allowed innocent spouse treatment. We find that the third condition has been met in that we are convinced by W's testimony that she was unaware of H's business activities. We have found as a fact that W handled none of the family finances, and had little, if any contact with H's business associates. See Terzian v. Commissioner,72 T.C. 1164 (1979). She ran the household with only that money given her by H. Further, W spoke little, if any, English and understood little of the nature of the entries on the tax return that she signed. Although *31 W signed the return under penalties of perjury, we find that she reasonably relied on H's explicit or implicit representations to her concerning its contents. Respondent points once again to the testimony of Agent Franco to support his contention that W knew of H's unreported income. Agent Franco testified concerning a conversation with H in which H stated that his "lady" had helped him count money to be laundered. W denies that she ever assisted H and objects to this testimony. Franco's testimony is not admissible as an admission by a party-opponent under Fed. R. Evid. 801(d)(2) or a statement against interest under Fed. R. Evid. 804(b)(3). W's objection is therefore well taken. Although any statement that W assisted H in counting his collections was not actually uttered by W, such a fact does not necessarily preclude the applicability of Fed. R. Evid. 801(d)(2). [16] Vicarious admissions are admissible when the party against whom it is offered authorized the making of the statement, adopted it as his own, or the statement was made by an agent or co-conspirator within the scope of those relationships. We find none of these to be the case; H was certainly not the agent or employee *32 of W, and respondent has not alleged the existence of a conspiracy between them. Consequently, Fed. R. Evid. 801(d)(2) is inapplicable. Neither do we find Fed. R. Evid. 804(b)(3) to be applicable. Keeping in mind that it was H that made any such statement, it was not against his interest, and therefore is inadmissible as an exception to the hearsay rule. Respondent also points to the fact that before petitioners' 1981 tax return was filed, H had already been arrested for an offense which gave rise to what respondent believes to be illegal income. Respondent had also issued his notice of termination assessment to petitioners before the return was filed. Respondent argues that these facts are enough to place W on notice that H had unreported income. As W could read little or no English, we doubt that the receipt of the notice of termination assessment could have meant anything to her. [17] Given H's complete control over the family's financial affairs, it is entirely possible that she never even saw such a document. Further, the case law is replete *33 with instances in which the "guilty" spouse is arrested for an offense which is to have given rise to the unreported income. [18] We find that these factors do not require us to withhold the safe harbor of innocent spouse treatment, and further find that W did not know of and had no reason to know of any unreported income of H. Finally, W must show that it would be inequitable to hold her liable for the deficiency. This determination is to be made after considering all the facts and circumstances and whether W benefited from H's unreported income. Mysse v. Commissioner,57 T.C. 680 (1972). [19]
Petitioners did not own their own home but rented a rather modest house. W owned little, if any jewelry and other such items. Petitioners owned two cars, one of which was forfeited to the United States Government as part of the criminal action against H. A fact of some *34 significance is Agent Franco's testimony concerning H's statement that he secretly took large sums of cash out of the country, which he concealed from even W. Respondent has not alleged that W was aware of these actions by H. We therefore find that W derived no benefit from H's unreported income and that she is entitled to relief under section 6013(e) to the extent of tax liability attributable to H's unreported income. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent did not seek an addition to tax under section 6653(a)(2). ↩
3. Respondent has conceded that $ 55,000 of expenditures were previously included in income as part of the calculation of bank deposits. ↩
4. These documents, which were in Spanish, were made exhibits with accompanying translations. They appear very similar to promissory notes but are not signed by either H or W. 5. The parties have stipulated that the average dollar to peso exchange rate in 1981 was 1:54.49. At this rate, 7,350,000 pesos is the Colombian equivalent of $ 134,887.14. Since respondent disputes the fact of the loan and not the amount, we will consider it evidence of a $ 150,000 payment. ↩
6. Jorge was deceased at the time of trial. ↩
7. This conversation was taped and the translated transcript stipulated to by the parties. ↩
8. There is no explanation as to the necessity of a currency transaction report for money already in the United States. ↩
9. Case No. 81-337-CR-JE (S.D.Fla.). ↩
10. The tax determined on the notice of deficiency is based on $ 501,000 of unreported income. Respondent concedes that this sum should be reduced by $ 55,000. ↩
11. Petitioners objected to the materiality and relevancy of these stipulated facts. See n. 13. 12. Had respondent raised this new theory in a timely fashion, he would bear the burden of proof in respect thereto. Because we decline to consider this new theory, we need not decide if he would have carried that burden. 13. Similarly, in Fox Chevrolet, Inc. (Maryland) v. Commissioner,76 T.C. 708↩ (1981), a dispute arose at trial over what constituted an "item" for LIFO inventory purposes. In refusing to consider respondent's argument, we found that the issue had not been raised in the pleadings, stipulations, exhibits, or trial memoranda. 14. Since we decline to entertain respondent's new theory of liability, we need not pass on petitioners' relevancy and materiality objections with respect to this same evidence. ↩
15. Our calculations indicate that the decision we reach eliminates the deficiency completely. However, we prefer that the parties make their own calculations under Rule 155, and we therefore decide the remaining issues raised in respondent's statutory notice and not already conceded by either party. ↩
16. A statement admissible under Fed. R. Evid. 801(d)(2)↩ is not admissible as an exception to the hearsay rule, but rather is not hearsay. 17. On September 6, 1982, the termination assessment was abated to reflect the same amount as set forth in respondent's statutory notice of deficiency dated September 20, 1982. ↩
18. See Johnson v. Commissioner,T.C. Memo. 1980-569; Grosso v. Commissioner,T.C. Memo. 1980-186↩. 19. See also Liddy v. Commissioner,T.C. Memo. 1985-107↩.