MANUEL CEBOLLERO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cebollero v. Commissioner
Docket No. 9396-88
United States Tax Court
T.C. Memo 1990-618; 1990 Tax Ct. Memo LEXIS 693; 60 T.C.M. (CCH) 1379; T.C.M. (RIA) 90618; December 6, 1990, Filed *693 Decision will be entered under Rule 155. Stephen P. Kauffman, for the petitioner. Deborah Y. Clark and William T. Lyons, for the respondent. COLVIN, Judge. COLVIN
*1996 MEMORANDUM FINDINGS OF FACT AND OPINION Petitioner owned a beer and wine retail store which had two cash registers. Petitioner did not report all of the receipts from one of the cash registers *694 during 1982 - 1984, the taxable years at issue here. Respondent used a cost percentage markup method to reconstruct petitioner's income for 1982 through 1984, and determined petitioner's deficiencies in and additions to Federal individual income tax as follows: [1] *1997 Additions to Tax
Section
Section
Section
Year
Deficiency
6653(b)(1)
6653(b)(2)
6661
1982
$ 18,287.64
$ 9,143.82 *
$ 6,767.14
1983
16,914.23
8,457.67 *
5,702.52
1984
17,630.01
8,815.51 *
4,397.60
* 50 percent of the interest due on the underpayment caused by fraud. At trial, petitioner conceded that his failure to report all receipts from the second cash register was fraudulent. *695 The issues to be decided are: 1. Whether respondent's use of the cost percentage markup method to reconstruct petitioner's income is reasonable. We hold that it is, with minor modifications. 2. Whether respondent's agent may base her analysis of petitioner's income in part on information which would be hearsay if offered to prove its truth through respondent's agent's testimony. We hold that she may. 3. Whether petitioner's expert witness is permitted to testify where there was no notification to respondent that he would testify until after the calendar call of the case and shortly before trial, and no expert report was prepared. We hold he is not. 4. Whether the addition to tax under section 6661 for substantial understatement of income tax is applicable to petitioner. We hold that it is. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner resided in Silver Spring, Maryland, when the *696 petition was filed. He has Bachelor of Science degrees in mechanical engineering and electrical engineering. He had no training in accounting or bookkeeping. In December 1955, petitioner married June Cebollero, now know as June Flory (Ms. Flory). They were married during all of the years at issue. Petitioner was also a 50-percent partner with Ms. Flory in a partnership called Belby Discount Beer and Wine (Belby) during these years. Petitioner and Ms. Flory were divorced in 1985. Petitioner's filing status was married filing separately for his 1982 and 1983 Federal income tax returns, and single for his 1984 return. The parties have stipulated that petitioner's correct filing status for 1984 is married filing separately. Petitioner prepared his personal 1982, 1983, and 1984 returns. Petitioner knowingly failed to report all of his partnership income. Petitioner skimmed unrecorded cash from Belby during the years at issue. On April 11, 1988, he pled guilty to a charge of willfully subscribing to a false return for 1983 under section 7206(1). 2. Belby Discount Beer and Wine
Petitioner and his former wife, Ms. Flory, acquired Belby in December 1976. Belby *697 is a retail beer and wine sales store. It was owned and operated as a partnership, with petitioner and Ms. Flory its only partners. Petitioner and Ms. Flory worked at Belby, along with several part-time employees. Petitioner also hired a part-time bookkeeper. The bookkeeper was unaware of the understatement of gross income. Belby was located in Montgomery County, Maryland, and licensed by the Montgomery County Liquor Control Board (the Board). All of Belby's beer and wine purchases were from the Board. Petitioner's primary duties at Belby were to make inventories of beer and wine and order those items from the Board. Petitioner also set the price of beer and wine for sale. Typically, he would make a physical inventory of both beer and wine and compare the result with the previous week's inventory to determine the amount sold during the week. He would then order the *1998 difference. He made adjustments for holidays and local temperature or weather. Petitioner also hired, fired, and trained employees. Ms. Flory ordered sundries such as cigarettes and candy, closed out the cash registers, and posted the books and records. Belby was open 365 days a year. The *698 hours were 10 a.m. to 10 p.m. in winter, 10 a.m. to 11 p.m. in summer, and 10 a.m. until midnight on Friday and Saturday nights. Friday was the busiest day. Belby operated with two shifts, one from 10 a.m. to 5 p.m., and the second from 5 p.m. until closing. Sales were summarized twice a day. At the end of each shift, the total receipts for the shift were summarized when the register produced a Z-tape. Usually Ms. Flory totaled the cash receipts and reconciled the cash collected with the Z-tape. During the years 1982, 1983, and 1984, petitioner's practice was to mark up beer and wine by a certain percentage. Petitioner's markup of his inventory remained generally constant throughout the years at issue and 1985. Petitioner's sales mix was generally consistent during the years 1982, 1983, and 1984. About 75 percent of Belby's sales were from beer. Six-pack sales accounted for 40 percent of beer sales, and cases accounted for 60 percent. Beer purchases constituted 73.9, 72.7, and 72.1 percent of Belby's purchases from the Board in 1982, 1983, and 1984, respectively. For the years at issue and 1985, Belby's markup was 22 percent on beer sold by the case, and 35 percent *699 on six-packs. From time to time, the Board offered beer to retail beer and wine licensees at lower than cost. The retailer could set any price for the beer. Belby sold some beer at prices below the usual markup every week. During sales, Belby offered between two and four brands of beer at discounted prices. Petitioner placed a large number cases of beer on sale with a big bull's-eye advertisement in front of the store. During sales, petitioner sold beer a few pennies above or below cost. Although Belby advertised at the outset, petitioner found it to be more effective to simply stack the sales-priced beer on sale in front of the store. For the years at issue, Belby's wine inventory was classified in two categories, wine regulars and wine specials. Approximately 90 percent of sales were regular wines and 10 percent were special order wines. Petitioner's markup for regular wines was 25 percent for the years at issue and 1985. Wine specials were sold at a higher markup than wine regulars. For the years at issue, the markup for special order wines was between 25 and 60 percent, and averaged about 50 percent. Sundry items accounted for 10 percent of petitioner's overall *700 sales. The markup for sundries averaged the same as the markups on beer and wine. Belby experienced some breakage of beer and wine purchased from Montgomery County. Petitioner filed suit against the Board in an effort to force the Board to modify its breakage refund policy. Petitioner kept no records of breakage or spoilage. Belby experienced some problems with theft. Some of the thefts were by employees. Petitioner and Ms. Flory once caught an employee taking $ 150 in cash. On another occasion, petitioner apprehended an employee stealing merchandise worth more than $ 100. Belby used two cash registers to collect and record cash receipts. Only one was used daily, while the other was used only on busy days such as weekends and holidays. Petitioner instructed Belby cashiers to ring up all sales. Petitioner kept a handwritten cash receipts journal, a handwritten disbursements journal, cash register tapes, standard payroll records, sales tax records, and general business records, such as excise tax forms. Belby's cash disbursement journal separately listed checks to Montgomery County for beer and wine purchases. Books and records were maintained and the income tax returns *701 were filed for the years at issue using the cash method of accounting. Petitioner and Ms. Flory devised a scheme to understate Belby's gross receipts. Under their scheme, most of the receipts from the second register were not recorded in the Belby cash receipts journal. At times petitioner and Ms. Flory became concerned that the amount of unreported income was excessive, and so some of the sales from the second register were re-rung on the first register. Petitioner and Ms. Flory agreed to divide the unrecorded receipts equally. The unrecorded receipts were not reported on Belby's partnership returns. The partnership filed a partnership income tax return for each of the three years at issue. During the years at issue, the partnership underreported gross receipts. Petitioner helped prepare those returns. At the time Belby's 1985 partnership tax return was due to be filed, the business was being operated by Ms. Flory as a court appointed trustee. Belby's operated in a competitive environment. Jumbo, a competitor, was located six to eight blocks from Belby. Jumbo placed big advertisements in the newspaper for beer and wine. Rodman's Discount Beer & Wine was located one block *702 from Belby. The Board stores *1999 also sold regular wines in direct competition with stores such as Belby. Before July 1, 1982, licensed retailers in Maryland were permitted to sell beer and light wine to any person over the age of 18 years. Beginning July 1, 1982, licensed retailers were permitted to sell beer and light wine to any person who was over the age of 21 or to any person who was 18 before July 1, 1982. The partnership was dissolved in 1985 and the store was sold in 1986. 3. The IRS Audit and Respondent's Determination
a. The Audit
Revenue Agent Laura Sencer examined the returns of Belby and petitioner. She had seven years' experience in private industry as an accountant followed by seven years of public accounting. She received her bachelor's degree from the Peabody Institute of John Hopkins University and is a certified public accountant in the State of Maryland. In the course of the audit, Ms. Sencer sent petitioner a letter for an appointment to examine his tax liability. He responded by telephone to confirm it. Ms. Sencer kept the appointment, visiting petitioner at Belby on a Friday in March 1985. Ms. Sencer took notes at that *703 meeting. She and petitioner discussed the manner in which petitioner's books and records were kept, the kind of books and records that he had, how sales and expenses were recorded, his hours of operations, and other background facts in preparation for the examination of the books and records. They discussed what he sold, his markup policy, and sales mix. Petitioner told Ms. Sencer that he had one cash register which he used to ring up all of his sales. Ms. Sencer took the Belby books and records back to her office to reconcile Belby's bank deposits, sales, and cash register tapes with either the books and records or the returns. She was unable to reconcile the records. Ms. Sencer then attempted to verify the percentage markups provided by petitioner. During the interview in March 1985, petitioner had told Ms. Sencer the amount of his markups, and that his markups had been constant from year to year. Petitioner gave Ms. Sencer a copy of a price list. Ms. Sencer verified the prices with prices on the walls. She then telephoned the Board to verify petitioner's cost of goods sold. She compared the Montgomery County prices with petitioner's price list and discovered that petitioner's *704 markup was exactly what he had said it was. It was 35 percent for six-packs and 22 percent for cases of beer. Ms. Sencer verified petitioner's markup figures by dividing the sales price obtained from the price list by the cost and arrived at 22 percent for beer six-packs. She verified the markup for each of the listed beers using this method. Her independent verification procedures confirmed that the markup figures provided to her by petitioner were correct. Ms. Sencer then verified petitioner's purchases. Petitioner had told Ms. Sencer that all Belby purchases were made by check. She then compared all check purchases in excess of $ 50 with petitioner's cash disbursements journal or check journal. She took his bank statements and verified that the checks written on his bank account matched that in his journal. She also verified that the checks were made payable to Montgomery County. Ms. Sencer then applied petitioner's markup to his purchases and discovered a very large understatement of gross income. She showed petitioner the figures. When petitioner was asked if there could be anything wrong with her figures, he mentioned employee theft and that some beer was sold at a *705 discount. Petitioner said that on a quarterly basis Montgomery County inspected his wine to ensure that all wine on his shelves was good, and that he was required to break some bottles. Ms. Sencer asked petitioner what he thought of the figure of $ 5,000 for spoilage and theft. Petitioner said that it was okay. Petitioner was unable to explain the large understatement of gross income. Ms. Sencer then concluded that the situation was fraudulent. She referred the case for criminal investigation. Ms. Sencer acknowledged that petitioner sold some products at sale prices, but she did not know how much he was selling below his regular prices or below cost. She made no adjustments for sales. Petitioner told the revenue agent during the audit in February or March 1985 that his markup remained constant in the years at issue. On August 2, 1985, during a criminal interview with the revenue agent also present, petitioner told a special agent that he increased his markup within recent years, but he didn't remember when. However, during the August 2, 1985, interview, petitioner reiterated the same markups that he had told the revenue agent that he used during the years at issue. OPINION
*706 Respondent reconstructed petitioner's gross receipts from petitioner's retail beer and wine business for taxable years 1982, 1983, and 1984, using the percentage markup method. Under this method, gross sales are determined by adding a predetermined percentage to cost of goods sold. Bernstein v. Commissioner, 267 F.2d 879, 880 (5th Cir. 1959), affirming a Memorandum Opinion of this Court. The predetermined percentage *2000 markups were obtained in interviews with petitioner, and verified by respondent's revenue agent. Petitioner concedes that he participated in a plan to conceal income from the second cash register at his beer and wine retail store. However, petitioner contends that respondent's notice of deficiency is not entitled to a presumption of correctness because the determination set forth in the notice of deficiency is arbitrary and excessive under the rationale of Helvering v. Taylor, 293 U.S. 507 (1935). 1. Percentage Markup Method
Where a taxpayer's records are inadequate, the Commissioner is authorized to compute income by any other reasonable method, Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir. 1968); *707 Burka v. Commissioner, 179 F.2d 483 (4th Cir. 1950); Harbin v. Commissioner, 40 T.C. 373, 377 (1963); Hutcherson v. Commissioner, T.C. Memo. 1984-165; Wright v. Commissioner; T.C. Memo. 1967-86. Where reconstruction of a taxpayer's income is necessary, respondent has great latitude in the method used. The method, however, must produce a result that is reasonable and substantially correct. Mendelson v. Commissioner, 305 F.2d 519, 523 (7th Cir. 1962). Although respondent's reconstruction of income need not be exact, it must be "reasonable in light of all surrounding facts and circumstances." Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). The percentage markup method is well recognized as an appropriate means of reconstructing income where a taxpayer's records are incomplete or inaccurate. Bollella v. Commissioner, 374 F.2d 96 (6th Cir. 1967), affirming a Memorandum Opinion of this Court, upholding the percentage markup method; Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956), affirming a Memorandum Opinion of this Court; Western Supply & Furnace Co. v. Commissioner, 295 F.2d 341 (7th Cir. 1961); *708 Bernstein v. Commissioner, supra; Stone v. Commissioner, 22 T.C. 893, 905-906 (1954). Taxpayers are required to keep records which are sufficient to enable respondent to determine their correct Federal income tax liability. Sec. 6001. Petitioner does not claim that his books and records for the years in question were adequate. Respondent's revenue agent attempted to reconcile petitioner's records with his returns, but was unable to do so. Accordingly, she chose to reconstruct petitioner's gross receipts by applying the percentage markup method to petitioner's costs. Petitioner argues that respondent's application of the percentage markup method here is arbitrary and excessive. Petitioner argues: a. The revenue agent failed to adjust for Belby's sales of beer at lower-than-advertised prices. b. The revenue agent allowed only $ 5,000 per year for broken, spoiled, and stolen inventory. c. The revenue agent applied a markup percentage derived by applying 1985 prices to 1982, 1983, and 1984. d. The revenue agent did not follow Internal Revenue Manual procedures considering industry averages when examining beer and wine stores. *709 e. Petitioner produced competent and convincing evidence of respondent's errors, while respondent failed to produce evidence to refute petitioner's testimony. We will first examine respondent's application of the percentage markup method. Respondent's agent verified the markups used by petitioner during the years at issue. Petitioner told her that his markup was 22 percent for beer cases, 35 percent for beer six-packs, 25 percent on wine regulars, and an 25 to 60 percent for wine specials. To verify this, she obtained the costs of the other brands of beer from the Board. She compared that information with the prices for which petitioner had sold beer and verified the percentage markup as being 22 percent for cases and 35 percent for six-packs. She also verified that wine regulars were marked up 25 percent. She found that the markup for wine specials varied greatly, but found the average to be about 50 percent. Thus, petitioner's own statements as to his markups were verified. Petitioner denies that he told the revenue agent that his markups were constant, pointing to his statement to an IRS criminal investigation division special agent. The special agent asked petitioner *710 if Belby's prices were constant during the period 1982 through 1984. Petitioner replied that Belby's markups had been increasing, but he couldn't recall when. We believe that petitioner's statement initially made to the revenue agent was more credible. We note also that petitioner conceded that his markup on wine regulars remained constant. He provided no reason that wine regulars would be treated differently from his other merchandise. Respondent's revenue agent also confirmed the sales mix between wine and beer which had been supplied by petitioner. The agent compared Belby's wine and beer purchases in the cash disbursement journal to confirm the sales mix. She found that the average over the three years at issue was 72.9 percent for beer sales. *2001 This is close to the estimate made by petitioner during the audit of 75 percent for beer sales. Thus, the sales mix that petitioner supplied to the agent was confirmed. Petitioner kept no records of breakage, theft, spoilage, discounts, or sales mix. However, the revenue agent allowed $ 5,000 for broken, spoiled, or stolen inventory. When breakage and spoilage was discussed during the examination, petitioner agreed *711 with the revenue agent's allowance for it. Petitioner described two incidents of employee theft, but did not indicate whether they occurred during the years at issue. Petitioner testified that he filed a lawsuit against the Board because of breakage and that he estimated breakage to be one and one-half to two percent. He provided no basis for this estimate. He also testified that he sued because Montgomery County suspended beer delivery that left him without beer for a week. The record does not contain any documents or corroborating evidence supporting an allowance for broken, spoiled, or stolen inventory in excess of the $ 5,000 allowed by respondent's agent. Petitioner argues that the change in legal drinking age in 1982 from 18 to 21 years of age was not properly considered by respondent. Petitioner argues that the change in the legal drinking age in Maryland in July 1982 reduced the number of his customers. Petitioner argues that his response was to raise the markup to compensate for lost volume. Regardless of the drinking age change, petitioner has not convinced us that he did raise the markup, or that respondent's estimate of petitioner's markup or sales volumes *712 was defective. Petitioner also contends that respondent's markup for sundry items was incorrect and that it should have been lower than that on beer and wine. Ms. Sencer testified that petitioner told her that the markup for sundry items was generally the same as beer and wine. Petitioner has not convinced us that his statement to Ms. Sencer was wrong. On occasion, Belby sold beer at sales prices, including some at and near cost. Ms. Sencer agrees that petitioner probably did sell below cost at times, but petitioner provided no evidence as to how much was sold below cost. We believe that sales were sufficiently significant that an adjustment should be made for them. However, petitioner's testimony that he placed one- seventh of the beer cases on sale was uncorroborated and unsupported by business records. On brief petitioner argues that the sale amount should be marked up at 2.2 percent. Taking into account all of the facts and circumstances, we believe that petitioner should be entitled to adjustments to gross income allowing 10 percent of the beer cases per year to be marked up 2.2 percent. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). *713 In an earlier liquor store unreported income case using the percentage markup method, we noted: From the record, it appears to us that the Commissioner computed the liquor markup from the only available evidence; the obligation to keep records that might more accurately reflect the liquor income was [the taxpayer's]. Sec. 6001. Having neglected his duty to do so, he cannot now condemn the Commissioner's computation * * * Hutcherson v. Commissioner, T.C. Memo. 1984-165, 47 T.C.M. 1421, 1425, 53 P-H Memo T.C. par. 84,165 at 84. Petitioner's argument about respondent's alleged failure to follow the Internal Revenue Manual provisions is also unpersuasive. Petitioner has not referred us to a specific section of the Manual. Further, regardless of any reference the manual may make to consideration of industry data, we believe respondent's agent's reconstruction of petitioner's income is entitled to greater weight. Having found respondent's reconstruction of petitioner's income to be reasonable, we disagree with petitioner's argument that the notice of deficiency is arbitrary and excessive such that the burden of going forward with evidence is *714 on respondent. In light of the foregoing, respondent's determination is sustained as adjusted.
2. Presumption of Correctness and the Burden of Going Forward With Evidence Generally, respondent's determinations are entitled to a presumption of correctness, and petitioner bears the burden of rebutting that presumption by a preponderance of the evidence. Welch v. Helvering, 290 U.S. 111, 115 (1933); United States v. Pomponio, 635 F.2d 293, 296-297 (4th Cir. 1980). We do not generally look behind a notice of deficiency to examine the basis for the determination of a deficiency. Riland v. Commissioner, 79 T.C. 185, 201 (1982); Jackson v. Commissioner, 73 T.C. 394, 403 (1979); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). However, where the notice of deficiency is found to be arbitrary, the burden of going forward with the evidence is shifted to respondent. Helvering v. Taylor, 293 U.S. 507 (1935); Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979); Jackson v. Commissioner, supra, at 403. Petitioner *715 contends that the notice of deficiency in this case is arbitrary, and that, as a result, respondent bears the burden of going *2002 forward to establish the existence and amount of the deficiency. Fraud was determined and alleged in the notice of deficiency, but petitioner has now conceded fraud. The burden of going forward as to the underlying deficiency does not shift to respondent merely because fraud is determined. Zack v. Commissioner, 692 F.2d 28 (6th Cir. 1982); Drieborg v. Commissioner, 225 F.2d 216 (6th Cir. 1955). Petitioner has the burden of going forward as well as of proving that respondent's determination is arbitrary and excessive. Coomes v. Commissioner, 572 F.2d 554 (6th Cir. 1978). Petitioner cites Foster v. Commissioner, 391 F.2d 727 (4th Cir. 1968), an unreported income case from the Fourth Circuit Court of Appeals, the court to which appeal lies in this case, which stated: The burden of proof is on the Commissioner to show that the taxpayer received income. This burden is initially satisfied, however, by the fact that the Commissioner's deficiency determination is presumed correct. *716 The burden is thus on the taxpayer to prove the incorrectness of the deficiency determination . [Fn. ref. omitted.] This burden is procedural and is met if the taxpayer produces competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice. In other words, the taxpayer at this point has the burden of producing evidence or of going forward with the evidence. If this burden is met, the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency. Foster v. Commissioner, supra at 735. Petitioner alleges that he has produced competent evidence which establishes that he did not receive the amount of income alleged in the notice of deficiency, and which establishes that respondent's notice of deficiency is arbitrary, excessive, and incorrect, thereby negating the presumption of correctness. We disagree. We do not agree that petitioner has produced evidence establishing the incorrectness of respondent's determination. The only evidence before the Court to establish that petitioner did not receive the income determined by respondent is petitioner's *717 testimony. He provided no business records or other corroboration for his testimony. Petitioner argues that respondent had named his ex-wife and former partner, Ms. Flory, as a witness who could have corroborated his testimony or the testimony of the revenue agent. However, respondent was under no duty to call Ms. Flory as a witness. After considering all of the evidence in this case, we hold that the burden of going forward is not shifted to respondent. The burden of going forward as well as the burden of proof is on petitioner. Rule 142. Under these circumstances, we hold that respondent's application of the percentage markup method was a reasonable method to reconstruct petitioner's income. Respondent's determination of deficiencies for 1982, 1983, and 1984, are sustained with adjustments for below normal markup sales. 3. Evidentiary Issues
a. Revenue Agent Telephone Conversation with the Montgomery County Liquor Control Board During trial, respondent's revenue agent, Laura Sencer, testified that she telephoned the Board to verify petitioner's costs. Petitioner objected to her testimony describing the cost information given to her during the telephone call *718 as hearsay. The objection was overruled. Ms. Sencer needed to obtain cost information from the Board to determine markup and gross profit. It is true that if respondent testified as to what she was told during telephone calls about these prices in Court to establish the truth of the matter, it would be hearsay. However, her testimony about the prices is not hearsay here because it was not offered to prove the truth of the matter, but to show that respondent's technique used to apply the cost percentage markup method to petitioner was reasonable. We note that because petitioner conceded fraud and because of the facts and circumstances of this case, we are not faced with the issue of whether respondent must offer admissible evidence to establish that petitioner had any connection to the unreported income. See Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986). b. Petitioner's Expert Witness
At trial petitioner called Peter C. Santoni as a witness. Respondent objected because Mr. Santoni was not identified 15 days before the trial session as a witness for petitioner as required by the Court's pretrial order. The pretrial order applicable to *719 this case states that witnesses who are not so identified will not be permitted to testify at trial without leave of the Court upon sufficient showing of cause. Respondent was not informed that Mr. Santoni would be called as a witness until the morning of trial. Respondent also objected to Mr. Santoni's testimony on grounds that it was to be expert testimony, but no expert witness report had been presented 15 days in advance, as required by Rule 143(f) as in effect at the time. Petitioner argued that he had not received the revenue agent's work papers in sufficient time to identify Mr. Santoni as his witness. However, petitioner knew respondent's methodology for a considerable period of time. The statutory notice of deficiency includes a 15-page explanation of the adjustments fully setting *2003 forth the basis for adjustments including the markup method. Petitioner's claim of insufficient time to provide notice that Mr. Santoni would be a witness did not convince the Court of good cause for the lack of notice. We have enforced the 15-day rule of our pretrial order by excluding evidence. E.g., Gray v. Commissioner, T.C. Memo. 1990-283; see Facuseh v. Commissioner, T.C. Memo. 1988-10. *720 Accordingly, we believe respondent's objection was appropriately sustained. c. The Dunn & Bradstreet Industry Profile for Liquor Stores At trial, petitioner argued that a Dunn & Bradstreet Industry Profile for Liquor Stores (profile) was admissible under Federal Rules of Evidence 803(18). Because Mr. Santoni was precluded from testifying in this case, and petitioner offered no other foundation for introduction of the profile under Federal Rules of Evidence 803(18), the profile is inadmissible, and was not considered in deciding this case. However, we would not have reached a different result if we had considered the Dunn & Bradstreet profile. It shows average profit margins for 476 liquor stores in 1983. Here, we would give little or no weight to industry averages because respondent's analysis provides better information. d. Petitioner's Version of the 1985 Return
During trial, petitioner offered into evidence a document purporting to be the Belby 1985 Partnership Return. However, petitioner was unable to authenticate the document. Ms. Sencer and petitioner were asked to identify it, but neither could. The document bears the signature of Lawrence Keane, CPA. Petitioner *721 contends that the only way to authenticate the document is through the Internal Revenue Service. We disagree. It appears that Mr. Keane could have identified the document for purposes of Federal Rules of Evidence 901. The Court's pretrial order required that the parties exchange all documents which they intend to use at trial. Rule 91 requires the parties to stipulate to documents to the fullest extent possible. There is no showing of compliance with either the pretrial order or Rule 91. One purpose of these procedural rules is to allow the parties to address and resolve evidentiary matters such as this before trial. For these reasons, and because of petitioner's failure to authenticate the document, it was not admitted into evidence. 4. Substantial Understatement of Income Tax Under Section 6661
Section 6661 authorizes an addition to tax when there is a substantial understatement of income tax in any given taxable year. Sec. 6661(a). The addition to tax is equal to 25 percent of the amount of any underpayment attributable to the substantial understatement. Sec. 6661(a). A substantial understatement exists if in any year the amount of the understatement exceeds *722 the greater of 10 percent of the amount required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501 (1989); Woods v. Commissioner, 91 T.C. 88 (1988). The addition to tax under section 6661 for each of the years at issue is applicable to petitioner if the understatement as adjusted by this opinion is substantial. Decision will be entered under Rule 155. Footnotes
1. These amounts are as determined by a statutory notice of deficiency dated March 20, 1988, reduced by jeopardy assessments made on August 25, 1985. On October 21, 1985, respondent issued to petitioner with respect to a jeopardy assessment a statutory notice of deficiency for 1982, 1983, and 1984, determining income tax deficiencies in the amounts of $ 18,894, $ 15,043, and $ 5,633, additions to tax under section 6653(b)(1) in the amounts of $ 9,447, $ 7,521, and $ 2,816, additions to tax under section 6653(b)(2), and additions to tax under section 6661 in the amounts of $ 1,889, $ 1,504, and $ 5,636, respectively. Petitioner did not file a petition with respect to the October 21, 1985, notice of deficiency. On March 30, 1988, respondent issued a second statutory notice of deficiency to petitioner for 1982, 1983, and 1984, determining income tax deficiencies in the amounts of $ 37,181.64, 31,957.23, and 23,263.01, additions to tax under section 6653(b)(1) in the amounts of $ 18,590.02, $ 15,978.67, and $ 11,631.51, additions to tax under section 6653(b)(2), and additions to tax under section 6661 in the amounts of $ 8,656.14, $ 7,206.52, and $ 4,960.60, respectively. This notice of deficiency, however, did not account for prior jeopardy assessments made on August 25, 1985. The deficiencies set forth in this opinion take into account the prior jeopardy assessments. ↩